FRANCIS M. GREGOREK (144785)
BETSY C. MANIFOLD (182450)
FRANCIS A. BOTTINI, JR. (175783)
RACHELE R. RICKERT (190634)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

Attorney for Plaintiff

ORIGINAL
FILED
JUL 14 2003
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

[Additional Counsel Appear On Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JOSEPH J. MAHONEY, JR., On Behalf of Himself and All Others Similarly Situated,

Plaintiff(s),

vs.

INTERMUNE, INC., SCOTT HARKONEN AND SHARON SURREY-BARBARI,

Defendant(s).

Case No. C 03 3273 SI

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

BY FAX

Plaintiff, individually and on behalf of all other persons similarly situated, has alleged the following based upon the investigation of his counsel, which included a review of regulatory filings and reports, securities analyst reports and advisories about InterMune, Inc. ("InterMune" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of purchasers of the securities of InterMune between October 24, 2002 and June 11, 2003, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and InterMune conducts business in this District many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Joseph J. Mahoney, Jr., as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of InterMune at artificially inflated prices during the Class Period and has been damaged as a result of defendants' conduct as alleged

herein.

7. Defendant InterMune is a Delaware corporation and maintains its principal executive offices in Brisbane, California. According to its recent press releases, InterMune is a "commercially driven biopharmaceutical company focused on the marketing, development and applied research of life-saving therapies for pulmonary, hepatic and infectious diseases."

8. Defendant Scott Harkonen ("Harkonen") was at all relevant times InterMune's Chief Executive Officer, President and a director.

9. Defendant Sharon Surrey-Barbari ("Surrey-Barbari") was was at all relevant times InterMune's Chief Financial Officer and Senior Vice President of Finance and Administration.

10. Defendants Harkonen and Surrey-Barbari are referred to herein as the "Individual Defendants."

11. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of InterMune were privy to confidential and proprietary information concerning InterMune, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning InterMune, as discussed in detail below. Because of their positions with InterMune, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12. The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to, the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions

of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of InterMune's business.

13. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the Securities and Exchange Commission (the "SEC") pursuant to the Exchange Act, and was traded on the Nasdaq National Market ("Nasdaq") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to InterMune's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of InterMune's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of InterMune securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding InterMune's business, operations and management and the intrinsic value of InterMune securities, and caused plaintiff and members of the Class to purchase InterMune securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the securities of InterMune during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, InterMune common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by InterMune or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of InterMune; and

(c) to what extent the members of the Class have sustained damages and the

proper measure of damages.

21. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

22. The Class Period begins on October 24, 2002. On that date, InterMune released its financial and operational results for the third quarter ended September 30, 2002. The press release stated, in pertinent part, as follows:

> "Actimmune continues to be the primary driver of our revenue growth, and we anticipate total 2002 sales for this product to reach $95 to $100 million," said Scott Harkonen, President and CEO of InterMune. "Infergen® and Amphotec® sales also continue to grow, keeping us on track to achieve $105 to $110 million in total revenues in 2002."

23. At the analysts' conference call on October 24, 2002, InterMune disclosed it had an estimated 2,500 patients on Actimmune.

24. On January 30, 2003, InterMune issued a press release entitled "InterMune Annouces Senior Management Charge" announcing that David A. Cory, InterMune's Vice President of Sales, had left the Company and that Scott Harkoner, President and CEO of InterMune, would oversee David's area of responsibility until a replacement was named. The press release continued, in pertinent part:

> "We wish David well in his new endeavors and thank him for his many contributions to the company," said Dr. Harkonen. "InterMune now has an extraordinary sales force and a team of seasoned marketing professionals who are spearheading efforts to educate physicians about InterMune's products. We look forward to another year that extends our track record of growth and establishes InterMune's commitment to providing patients with promising therapies for unmet medical needs."

25. On February 19, 2003, InterMune released its financial and operational results for the fourth quarter and year ended December 31, 2002. The press release stated, in pertinent part:

> For the fourth quarter of 2002, InterMune recorded total product sales of $39.3 million, compared to $15.1 million for the same quarter in 2001, an increase of 161%. Sales of Actimmune® (interferon gamma-1b) for the fourth quarter of 2002 were $37.0 million, compared to $13.8 million in the same period in 2001, an increase of 168%.
>
> * * *
>
> "We are very pleased with InterMune's financial performance in 2002, which continues our track record of revenue growth based on strong sales of our lead product, Actimmune, along with steadily increasing sales of Infergen®," said Scott Harkonen, President and CEO of InterMune.
>
> * * *
>
> Financial Outlook for 2003
>
> InterMune also announced its financial guidance for 2003. The Company projects total net product sales for 2003 to be in the range of $170 to $195 million, with Actimmune net product sales projected to be in the range of $160 to $180 million for the full year.

26. At the analysts' conference call on February 19, 2003, InterMune disclosed it had an estimated 3,000 patients on Actimmune.

27. On April 29, 2003, InterMune released its financial and operational results for first quarter ended March 31, 2003. The press release stated, in pertinent part:

> For the first quarter of 2003, InterMune recorded total product sales of $40.4 million, compared to $18.8 million for the same quarter in 2002, an increase of 115%. Sales of Actimmune® (interferon gamma-1b) for the first quarter of 2003 were $37.9 million, compared to $17.7 million in the same period in 2002, an increase of 114%.
>
> "InterMune continued its track record of year-over-year revenue growth," said Scott Harkonen, President and CEO of InterMune. "We are on track to achieve our revenue projections for the year as we continue to build our commercial portfolio and pipeline of products for pulmonary, infectious and hepatic diseases."
>
> * * *
>
> Financial Outlook For 2003
>
> InterMune reiterates its previous revenue and expense guidance for 2003. The Company projects total net product sales for 2003 to be in the range of $170 to $195 million, with Actimmune® net product sales projected to be in the range of $160 to $180 million for the full year.

28. At the analysts' conference call on April 29, 2003, InterMune disclosed it had an estimated 3,300 patients on Actimmune.

29. Contrary to the representations and statements made by InterMune throughout the Class Period, such representations and statements were materially false and misleading when made as they misrepresented and/or omitted one or more of the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including, but not limited to:

(a) InterMune's estimated number of patients on Actimmune, disclosed throughout the Class Period as an accurate and valid means by which to register the level of strength of the demand for Actimmune, was "inherently" unreliable, inconsistent, and lacking in any accountable basis for presentation;

(b) there had been disruptions and problems with InterMune's sales and marketing efforts, including extraordinary turnover and lack of proper training;

(c) since at least the fourth quarter of fiscal 2002, InterMune was materially understating the level of inventory being held by its distributors, of which millions of dollars worth was being held in excess, and materially overstating its revenues;

(d) InterMune lacked adequate and sufficient internal controls and systems; and

(e) based on the foregoing, InterMune had no reasonable basis to issue its financial and operational projections.

30. On June 11, 2003, after the close of market, InterMune shocked the investing public when it provided "Updated 2003 Financial Guidance" and disclosed, in pertinent part, as follows:

> InterMune, Inc. announced today that the Company estimates second quarter 2003 Actimmune® (interferon gamma-1b) product sales will be in the range of $30 to $33 million. As a result, the Company has revised its full-year 2003 revenue guidance, which was stated in its April 29, 2003 press release. For Actimmune product sales, full-year guidance was revised from $160-$180 million to $135-$150 million and, for total product revenue, full-year guidance was revised from $170-$195 million to $145-$165 million. Although the Company is reevaluating ongoing operating expenses, operating expense guidance for the full-year 2003 remains as projected on April 29, 2003.

* * *

The Company's updated guidance is based on current assessments of underlying demand in the first half of 2003, changes in customer inventory levels and a correction of the Company's April 29th projection of approximately 3,300 patients on Actimmune therapy as of the end of the first quarter down to approximately 2,900 patients on Actimmune therapy during the first quarter.

31. Investor reaction was decisive, swift and negative. InterMune stock fell from a close of $25.10 on June 11, 2003 to a close of $16.74 on June 12, 2003, or a single-day decline of more than 33% on more than twenty-five times normal trading volume.

32. At the conference call on June 12, 2003, InterMune essentially admitted, among other things, that (i) its estimated number of patients on Actimmune, disclosed throughout the Class Period as an accurate and valid means by which to register the level of strength of the demand for Actimmune, was "inherently" unreliable, inconsistent, and lacking in any accountable basis for presentation, (ii) there had been disruptions and problems with InterMune's sales and marketing efforts, including extraordinary turnover and lack of proper training, and (iii) since at least the fourth quarter of fiscal 2002, InterMune was materially understating the level of inventory being held by its distributors and materially overstating its revenues.

33. A June 12, 2003 Dow Jones article entitled "Investors Flee InterMune Following Warning on Drug Sales" provided the following additional details:

> Shares of InterMune Inc. tumbled after the biotech company late Wednesday cut its sales views for Actimmune, a treatment for a disease that can end in respiratory failure.
>
> "Last night's announcement calls into question management credibility and makes an already controversial stock too risky to continue to recommend," Banc of America Securities analyst Michael King told investors in a research note.
>
> * * *
>
> InterMune, based in Brisbane, Calif., lowered its 2003 sales expectations for Actimmune to between $135 million and $150 million from its prior target of $160 million to $180 million. The company blamed the shortfall on inventory buildup and a correction of the number of patients on Actimmune at the end of the first quarter.

> The restatement of how many patients are using InterMune's Actimmune, down to 2,900 from 3,300, did more than lower the drug's sales. It also called into question the validity of the data provided by the company's management, said Mr. King. He added that because of the product's distribution, investors have to rely on InterMune's data as opposed to figures provided by a third party.

34. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and knew that such statements or documents would be issued, or acquiesced in the issuance or dissemination of such statements or documents, as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding InterMune, their control over, and/or receipt of information of InterMune's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning InterMune, participated in the fraudulent scheme alleged herein.

## UNDISCLOSED ADVERSE INFORMATION

35. The market for InterMune's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, InterMune's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired InterMune securities relying upon the integrity of the market price of InterMune's securities and market information relating to InterMune, and have been damaged thereby.

36. During the Class Period, defendants materially misled the investing public, thereby inflating the prices of InterMune securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading statements about InterMune's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of InterMune and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

38. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**FRAUD-ON-THE-MARKET DOCTRINE**

39. At all relevant times, the market for InterMune's securities was an efficient market for the following reasons, among others:

(a) InterMune's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, InterMune filed periodic public reports with the SEC and the NASDAQ;

(c) InterMune regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) InterMune was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

40. As a result of the foregoing, the market for InterMune's securities promptly digested current information regarding InterMune from all publicly available sources and reflected such information in InterMune's stock price. Under these circumstances, all purchasers of InterMune securities during the Class Period suffered similar injury through their purchase of

InterMune's securities at artificially inflated prices and a presumption of reliance applies.

**FIRST CLAIM FOR RELIEF**
**Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

41. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42. During the Class Period, InterMune and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of InterMune securities; and (c) cause plaintiff and other members of the Class to purchase InterMune's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

43. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for InterMune's securities in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

44. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports, to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, et seq.) and Regulation S-K (17 C.F.R. §229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete

and accurate information.

45. InterMune and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of InterMune as specified herein.

46. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of InterMune's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about InterMune and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of InterMune securities during the Class Period.

47. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

48. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing InterMune's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business,

operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

49. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of InterMune securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of InterMune's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired InterMune securities during the Class Period at artificially high prices and were damaged thereby.

50. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of InterMune, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their InterMune securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

51. By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

52. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM FOR RELIEF**
**Violation Of Section 20(a) Of The Exchange Act**
**Against All Defendants**

53. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54. The Individual Defendants acted as a controlling person of InterMune within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. InterMune controlled the Individual Defendants and all of its employees.

55. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

56. As set forth above, InterMune and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of InterMune's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as lead plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as lead counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 14, 2003

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
FRANCIS A. BOTTINI, JR.
RACHELE R. RICKERT

Rachele R. Rickert
RACHELE R. RICKERT

750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: 610/660-8000
Facsimile: 610/660-8080

Attorneys for Plaintiff

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

Joseph J. Mahoney Jr. ("plaintiff") declares, as to the claims asserted under the Federal Securities Laws, that:

1. Plaintiff has reviewed the complaint prepared by counsel and is willing to serve as a lead or named plaintiff in the Action on the basis of the allegations in that complaint or a substantially similar complaint or amended complaint to be filed. Plaintiff retains the Law Offices of Marc S. Henzel and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the Federal Securities Laws.

3. Plaintiff is willing to serve as a lead or representative party, either individually or as part of a group on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the stock of Intermune Pharmaceuticals, Inc. (Nasdaq: ITMN) that are the subject of this action:

| DATE | BUY OR SALE | AMOUNT OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| See attached brokerage | statements from my [illegible] Rowe Co | | |
| acc # [illegible] 02/21/03 | BUY | 100 | $18.789 |

5. In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

7. I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of July 2003.

Joseph J. Mahoney Jr.
Signature

4 PAGES

# BROWN & COMPANY

[illegible]

Page: [illegible] of [illegible]

Account Number: [illegible]

Telephone: [illegible]

## Transaction Activity Detail (continued)

| Date | Activity | Transaction Description | Quantity | Price | Transaction Amount | Account Balance |
|---|---|---|---|---|---|---|
| | SHORT ACCOUNT (continued) | | | | 377.80 | 10,[illegible] |
| 02/19 | JOURNAL | MARK TO THE MARKET | | | 131.00 | 10,[illegible] |
| 02/19 | JOURNAL | MARK TO THE MARKET | | | | |
| 02/21 | YOU BOUGHT | [illegible] | 100 | 17.[illegible] | -1,772.00 | 8,[illegible] |
| 02/21 | YOU BOUGHT | [illegible] INC | 100 | 10.7[illegible] | -1,0[illegible].00 | [illegible] |
| 02/21 | YOU BOUGHT | ADVANCED ENERGY INDUSTRIES INC AEIS | 100 | 10.[illegible] | -1,0[illegible].00 | [illegible] |
| 02/24 | YOU BOUGHT | AMARIN PHARMACEUTICALS INC AMRN | 100 | 16.[illegible] | -1,6[illegible].00 | 4,[illegible] |
| 02/24 | YOU BOUGHT | MYRIAD GENETICS INC MYGN | 100 | 11.0[illegible] | -1,10[illegible].00 | [illegible] |
| 02/24 | YOU BOUGHT | [illegible] PHARMACEUTICALS INC | 100 | 17.[illegible] | -1,7[illegible].00 | 1,310.00 |
| 02/25 | YOU BOUGHT | VERTEX PHARMACEUTICALS INC VRTX | 100 | 13.0[illegible] | [illegible] | 0.00 |
| | | Ending Balance | | | | [illegible] |